318 So.2d 676

**B. H. KLEIN and/or B. H. Klein Realty Corp., et al., etc.**

**v.**

**MR. TRANSMISSION, INC.**

**SC 773.**

Supreme Court of Alabama.

Aug. 21, 1975.

George H. B. Mathews, Montgomery, for appellee.

Miller, Hoffmann & Sundock, Montgomery, for appellants.

SHORES, Justice.

This is an appeal from a judgment entered on a jury verdict in the amount of $15,800 in favor of Mr. Transmission, Inc. (plaintiff) against B. H. Klein Realty Corporation (Klein) and Andrew & Dawson, individually and as partners doing business as a general building contractor. Roosevelt Jackson was also a defendant. He had entered into a subcontract with Andrew & Dawson to finish the wall after the original subcontractor walked off the job when the wall was approximately 70% complete. The jury returned a verdict in his favor.

Andrew & Dawson had contracted to build an addition to a building owned by Klein. Plaintiff occupied a building located directly north of the new addition and separated from it by approximately one and one-half feet. The north wall of the addition to the Klein building was 115 feet across and three stories high. It consisted of a brick veneer, 2-inch air space, and concrete block.

As of the end of work on May 23, 1973, the third floor portion of the north wall was tied in to the remainder of the building as follows:

At the floor level, the brick and block were resting on the floor. The brick had been "raised" all the way to the roof; and the block had been "raised" all the way to the ceiling. At the roof level, the brick was connected to the roof by dovetail anchors. The brick and block were connected to each other by metal ties. Pursuant to the specifications, these metal ties were to be spaced at 16-inch intervals, vertically. The north and east walls connected at the northeast corner of the addition. The west wall was complete through the second floor level, thus there was no connection for the north wall at its northwest corner. The north wall of the new addition collapsed on the night of May 23, and the third floor portion of the wall fell through the roof of the building occupied by the plaintiff.

Plaintiff's suit charged negligence in the construction of the wall in failing to brace it during the construction, and in failing to follow the specifications with regard to placing metal ties at 16-inch intervals.

The action was defended on the assertion that there was no negligence in failing to brace the wall; that it was constructed in accordance with procedures normally followed in the construction of buildings in Montgomery; and that the wall fell not because of any negligence on the part of the defendants, but because of an act of God. According to Taylor Dawson, the fall was caused by "A wind that you couldn't anticipate and couldn't protect against."

Andrew & Dawson, on appeal, argue that the trial court erred in denying the motion for directed verdict offered by them, because it is contended that the record is devoid of any evidence that the wall collapsed by virtue of any negligence on their part.

There is no question that the wall fell and damaged the building occupied by the plaintiff. What caused it to fall was a jury question. Each side offered evidence to support its position. From the plaintiff's side came testimony from an expert witness, a structural engineer, who testified that he examined the construction site on May 24, 1973, not at the request of the plaintiff but at the request of the owner of the damaged building; and that, based upon his examination of the building specifications for the addition and an examination of the building itself, it was his opinion that the wall should have been braced. The witness testified:

"A In my opinion, given the circumstances that I know and the peculiar sit-

uation of this wall, I think it should have been braced.

"Q  Tell the jury what you mean by peculiar situation relating to this wall. What was unique about this wall?

"A  As has already been described the wall is a hundred and fifteen feet long, or was a hundred and fifteen feet long, and eleven feet, five inches high. It did not have any intersecting walls or partitions except, of course, the east wall, northeast corner. . . ."

This witness also testified:

"A  At the stage of construction, it was not supported at the northwest corner, because of the absence of the west wall at the third floor.  The wall was in effect supported only at the floor and, if completed, only at the roof.  And I would—my evaluation as a structural engineer, I would think, it would be very weak in its structural strength in this condition until it had attained a full age as far as curing of the wall is concerned."

He defined curing as meaning that it takes a 28-day period for mortar to obtain its designed strength; and that the mortar in this wall had not obtained that strength, the last part of the wall having just been completed prior to the time the wall fell.

The defendants introduced evidence which tended to show that the building was constructed in accordance with standard acceptable practice for construction, and assert that there was no evidence that any improper construction in the wall itself contributed to its collapse.

However, the building specifications were admitted into evidence and provide in part:

"THE CONTRACTOR MUST TAKE ALL NECESSARY PRECAUTIONS TO INSURE THE SAFETY OF THE WORKMEN EMPLOYED ON THE JOB, TO PREVENT DAMAGE TO PERSONS AND PROPERTY NOT CONNECTED WITH THE JOB AND TO PREVENT THE OCCURRENCE OF ANY ACCIDENTS WHATSOEVER DURING THE PROGRESS OF THE WORK.

"  .   .   .

"THE CONTRACTOR . . . SHALL PROTECT AND CARE FOR SURROUNDING BUILDINGS, SHOULD THERE BE ANY DANGER TO THEM CAUSED BY THE WORK."

Additionally, Mr. Dawson, one of the contractors, testified that the Southern Standard Building Code applies to construction in Montgomery; and, although there was disagreement among the parties as to whether certain provisions applied, it was conceded by Mr. Dawson that Section 2101.10 did apply to construction in Montgomery.  That section provides:

"When a building or structure is to be carried above the roof of an adjoining building, protection for the skylights and roof of such adjoining building shall be provided, at his own expense, by the person constructing or causing the construction of such building or structure; provided that if the owner, lessee or tenant of the adjoining building should refuse permission to have the roofs and skylights protected, the responsibility and expense for the necessary protection shall devolve on the person refusing such permission."

Mr. Dawson testified that he had not sought permission, nor had the owners of the adjoining buildings refused to allow him, to protect the roofs of their buildings.

Roosevelt Jackson's pretrial deposition was entered in evidence.  It disclosed that when he took over the job of finishing the wall, the brick was approximately three feet short of the third floor and the con-

crete block was up to the third floor. When the wall fell on May 23, the block had been up to the third floor ceiling about two days. The brick had been "topped out" on May 23. Jackson said his responsibilities as masonry subcontractor were defined by his contract with the general contractor; he was not responsible for bracing the job; and, in his experience, bracing was never the subcontractor's responsibility.

"Q  Did anyone tell you to brace this wall as you were building it?

"A  No, no one told me to brace it. A subcontractor don't brace walls no way.

"Q  I see. You do what the plans and specifications and what the general contractor tell you to do in effect . . .

"A  I gets a contract from the general contractor, and it states that I'm supposed to do in my contract. It tells what I supposed to furnish and what I supposed to do. I'm supposed to furnish the mortar box, the mortar burgers, wheelbarrows, mortar mixes, saws where if necessary, and whatever necessary for me to lay the brick with. But I don't furnish no mortar mix, no material at all, and I don't brace. . . ."

Jackson's testimony was confirmed by Mr. Dawson, who said he hired Jackson to finish the masonry work and furnished Jackson with all of the raw materials.

There was evidence from which the jury could have concluded that the fact that the metal ties were not spaced at 16-inch intervals on all occasions by Jackson was not a contributing factor to the wall's collapse.

■  We find no error in the court's failure to grant Andrew & Dawson's motion for directed verdict. Without delineating any further evidence, which we think is unnecessary, suffice it to say that there was a scintilla of evidence, at the least, which required that the case against them

go to the jury. They argue in brief that the only testimony that the wall should have been braced came from the structural engineer, whose testimony is set out above, and that there was also evidence that the wall was constructed in accordance with the accepted practice for contractors, and that such practice does not require bracing.

■  What should have been done is fixed by a standard of reasonable prudence, whether it is usually complied with or not. *Roberts v. Kurn*, 231 Ala. 384, 165 So. 77 (1936). The court properly submitted the issue to the jury and defined negligence as follows:

"   . . . negligence means the failure to exercise reasonable or ordinary care, that is such care as is [sic, a] reasonably prudent person would have exercised under the same or similar circumstances. Now, that's what simple negligence is. In this case, it refers to the construction of a building. So it would have to be the same as a reasonable, prudent contractor in this particular area would have exercised under the same or similar circumstances.

"If you believe that the Defendants exercised that degree of caution, you might say, then you would have to find for the Defendants. If you agreed that they did not exercise that degree, then, of course, you could find for the Plaintiff. . . ."

■  The trial court, in its charge, made it clear to the jury that the standard of care was what a reasonably prudent person would have done under the same or similar circumstances; and also apprised them that they should consider what a reasonable, prudent contractor in this particular area would have done. We agree with Andrew & Dawson that custom or practice may be considered on the question of due care, but as stated in 65 C.J.S., Negligence, § 16:

"The common usage of a business or occupation is a test of care or negli-

gence, and is a proper matter for consideration in determining whether or not sufficient care has been exercised in a particular case, at least where the conduct in question is not inherently dangerous; but customary methods or conduct do not furnish a test which is conclusive or controlling on the question, and negligence may exist notwithstanding the conduct pursued or the methods adopted were in accordance with those customarily pursued or adopted."

■ Andrew & Dawson next argue that the trial court erred in refusing to grant their motion for a new trial. It is their contention that the jury's verdict is contrary to the great weight of the evidence. As we have often said, the decision of a trial court in refusing to grant a new trial on the ground of insufficiency of the evidence will not be set aside on appeal unless, after allowing all reasonable presumptions in favor of the correctness of the ruling, the preponderance of the evidence clearly convinces us that the verdict is wrong and unjust. *Woods v. Laster*, 291 Ala. 139, 279 So.2d 121 (1973); *Vinyard v. Duck*, 278 Ala. 687, 180 So.2d 522 (1965), and cases collated at Appeal and Error Key. No. 1005(4), Ala. Dig.

The last argument made by Andrew & Dawson is that the verdict of the jury is inconsistent with the law and the evidence, in that the defendant Roosevelt Jackson was found not guilty of negligence; and that absent such a finding, the jury could not find that Andrew & Dawson were guilty of negligence.

■ There is no error to reverse here. There is nothing inconsistent with the verdict in finding for Jackson and against Andrew & Dawson, if the jury believed, as apparently it did, that the wall fell because it was not properly braced. There was no evidence suggesting that Jackson was responsible for bracing the wall. One of the theories advanced by the plaintiff for the wall's collapse was that it was not built according to the specifications, in that the metal ties were not always spaced 16 inches apart, and at least two were found to be spaced 24 inches apart after Jackson commenced his work. However, there was also evidence that this failure was not a contributing factor in the collapse of the wall. Evidently, the jury believed this testimony.

The judgment in favor of the plaintiff and against Andrew & Dawson is affirmed.

■ We turn now to the position taken by Klein. At the close of the evidence, Klein asked for the directed verdict. The refusal of the court to grant that motion is assigned as error here. We agree that Klein was entitled to a directed verdict in its favor. We have read every word in the record and find that the evidence is without conflict that Klein, as owner, entered into a contract with Andrew & Dawson whereby Andrew & Dawson agreed to construct an addition to the Klein building. Andrew & Dawson were not agents of Klein. They were independent contractors. This state has long adhered to the proposition that the owner is not liable to third persons for the negligence of such independent contractors, absent certain exceptions which are not material here. *Dwight Mfg. Co. v. Vaughn*, 203 Ala. 462, 83 So. 327 (1919); *Scoggins v. Atlantic & G. P. Cement Co.*, 179 Ala. 213, 60 So. 175 (1912).

The judgment against Klein, is therefore, reversed and rendered.

In all other respects, the judgment appealed from is affirmed.

HEFLIN, C. J., and MERRILL, MADDOX and JONES, JJ., concur.